Billy Ray JOHNSON *v.* STATE of Arkansas

CR 94-615                                            889 S.W.2d 764

Supreme Court of Arkansas
Opinion delivered December 19, 1994

*Appellant*, pro se.

*Winston Bryant*, Att'y Gen., by: *Clementine Infante*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. This case is before us on review of a decision by the Arkansas Court of Appeals, following our granting of the state's petition for certiorari. We accepted review because the *en banc* court of appeals' vote to deny a rehearing was three-to-three and the case requires resolution for the correct and uniform administration of the criminal law. A single point on review is presented by the State — whether the trial court was correct in refusing to suppress evidence obtained during an investigatory stop of appellant Billy Ray Johnson's vehicle. We conclude that the trial court ruled correctly and we affirm.

On March 2, 1994, the court of appeals handed down an unpublished decision in *Johnson* v. *State*, No. CACR 93-497, in which a three-member panel reversed Billy Ray Johnson's conviction on a charge of possession of methamphetamine with intent to deliver, on the premise that the trial court should have granted his motion to suppress evidence because the investigatory stop of his vehicle and the subsequent search and seizure were predicated on an anonymous tip. Johnson had entered a conditional guilty plea, contingent on the outcome of his appeal of the trial court's denial of the motion to suppress, pursuant to A.R.Cr.P. Rule 24.3(b).

The state requested a rehearing, which was denied by a three-to-three division of the court of appeals sitting *en banc. See Johnson* v. *State*, 46 Ark. App. 67, 876 S.W.2d 607 (1994). The state filed a petition for certiorari, citing *Ferguson* v. *Order of United Commercial Travelers of America*, 307 Ark. 452, 821 S.W.2d 30 (1991). In that case we held that:

> We have traditionally granted certiorari for the review of tie-vote court of appeals' decisions that affirm a judgment of the trial court. This was the first case in which we

were asked to grant certiorari because of a tie vote denying rehearing. We concluded that the same policy should be applicable in both situations and granted certiorari.

307 Ark. at 453, 821 S.W.2d at 31.

■ This court granted the petition for certiorari on June 6, 1994. When we review a three-to-three decision of the court of appeals under Ark. Sup. Ct. R. 1-2(f), we consider the case as though it had originally been filed in this court. *Maloy* v. *Stuttgart Memorial Hospital*, 316 Ark. 447, 872 S.W.2d 401 (1994).

■ The facts presented to the trial court, with all presumptions favorable to the trial court's ruling, *Friend* v. *State*, 315 Ark. 143, 865 S.W.2d 275 (1993), are these: Officer Terry Grizzle had twenty-one years service with the Fort Smith Police Department, fourteen years in narcotics. He testified the department received an anonymous call advising that Billy Ray Johnson and Angela Highsmith were in a particular unit of the Stonewall Jackson Inn in Fort Smith selling crank (amphetamine and methamphetamine), using a blue van to make deliveries. Officers Grizzle, Howard and Sullivan immediately set up surveillance and when Johnson and Highsmith came out of the motel and drove off in the van, the officers made an investigative stop. Johnson readily agreed to a search of the van and a quantity of hidden crank was discovered. Grizzle had known Johnson for a number of years and had a rapport with him. He knew Johnson to have previous drug arrests and convictions. Officer Howard's testimony was that both Johnson and Highsmith had been arrested before for drug violations and the officers had received information within the past ninety days "off and on" that Johnson was involved with other individuals in drug sales. In this review we engage in all reasonable presumptions consistent with the ruling of the trial court. *Hudson* v. *State*, 316 Ark. 360, 872 S.W.2d 68 (1994).

■ The question before this court is: Was the trial court clearly wrong in deciding that the foregoing circumstances in their entirety were sufficient to arouse in trained police officers a reasonable suspicion of criminal activity? We believe that, given the totality of the circumstances, an investigative stop is precisely what should be expected of police officers. The search in this case was indisputably consented to by Billy Ray Johnson, hence, we are dealing with a mere stop, the least intrusive inter-

ference known to law enforcement. *See* 3 La Fave, *Search and Seizure*, § 9.3(e) at 486 (1987). Where the felonies or threats to the public safety are concerned, the government's interest in solving the crime and promptly detaining the suspect outweighs the individual's right to be free from a brief stop and detention. *United States* v. *Hensley*, 469 U.S. 221 (1985).

The landmark case dealing with investigative stops is *Terry* v. *Ohio*, 392 U.S. 1 (1968). Terry had appealed a conviction for carrying a concealed weapon. He was observed by a detective about 2:30 one afternoon. The officer's interest in Terry and two companions was aroused because they walked back and forth in a particular block peering in a store window and then conferring at the corner. The officer became suspicious and believed the men were "casing" the store for a robbery. He approached the men, identified himself as a police officer, and asked for their names; he was not acquainted with any of the three by name or sight and had received no information concerning them from any source. When the men "mumbled something" in response to his question the officer grabbed Terry, "spun him around" to frisk him and found a pistol in his overcoat pocket. The Supreme Court of the United States affirmed a decision of the Supreme Court of Ohio that the revolver was properly admitted in evidence, holding that the officer had reasonable grounds to believe that Terry was armed and dangerous and that his behavior justified an investigative stop. The court noted that the suspects had gone through a series of acts, while innocent in themselves, when taken together warranted further investigation. And while the officer could not rely entirely on his intuition, he could draw on his experience in observing people under a variety of circumstances.

██ The Arkansas Court of Appeals has recognized that judicial oversight in this area involves a balancing of the nature and extent of the intrusion against the attendant governmental interest. *Miller* v. *State*, 21 Ark. App. 10 (1987). Moreover, citing *Terry, supra,* and *Sibron* v. *New York*, 392 U.S. 40 (1968), the Court of Appeals has noted that a stop is "a far lesser intrusion than a frisk," as occurred in *Terry* v. *Ohio, supra. Leopold* v. *State*, 15 Ark. App. 292, 692 S.W.2d 780 (1985). Building on that rationale, it seems that the stop in *Terry* v. *Ohio*, based solely on the act of gazing into store windows, arguably what they were designed for, with no prior criminal history known to the officer,

more than validates an investigatory stop in this case based on direct information, albeit anonymous, of drug dealing by an individual known to the police to have a history of felony drug convictions and arrests. Unless the officers must entirely disregard the anonymous report of the alleged activity by Johnson and Highsmith, the totality of their information palpably arouses a reasonable suspicion. If an anonymous report can, with other circumstances, equate with probable cause, as in *Illinois* v. *Gates*, 462 U.S. 213 (1982), surely it can equate with reasonable suspicion, given the circumstances of this case. We conclude the police action in this case was based on a reasonable suspicion and was a permissible intrusion by means of an investigative stop. *Alabama* v. *White*, 496 U.S. 325 (1990); *Lambert* v. *State*, 34 Ark. App. 227, 808 S.W.2d 788 (1991).

The remarks of the Supreme Court in *Adams* v. *Williams*, 407 U.S. 143 (1972) are apropos to the case at hand:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be more reasonable in light of the facts known to the officer at the time.

For the reasons stated, the findings of the trial court were not clearly erroneous and, accordingly, the judgment appealed from is affirmed.

HOLT, C.J., DUDLEY and NEWBERN, JJ., dissent.

JACK HOLT, JR., Chief Justice, dissenting. I must respectfully dissent from the majority opinion. Because this case is so strongly fact-driven, it is necessary to set forth the circumstances leading to Billy Ray Johnson's arrest at some length.

On October 6, 1992, the Fort Smith Police Department received a telephone call from an unknown informant. The caller stated that Billy Ray Johnson and a companion, Angela Highsmith, were selling crank (the street name for amphetamine and

methamphetamine) in Room 56 at the Stonewall Jackson Inn. The anonymous tipster also described a blue van in the motel parking lot near the room. There was no indication of how the unidentified caller came into possession of the information.

Virginia Ross, a police department secretary who took the call, verbally notified Sergeant Steven Howard, who then relayed the information to Sergeant Terry Grizzle. Sergeants Howard and Grizzle, along with Detective Patricia Sullivan, immediately drove in an unmarked car to the motel parking lot, where they found the blue van and observed Highsmith leave a motel room and enter the van on the driver's side. A few minutes later, the Narcotics Unit officers saw Johnson leave a motel room and get into the van on the passenger's side. (No evidence appeared of record concerning the motel room number.) The two suspects then left the parking lot, and the officers called for a marked police car to stop them, without, however, giving a particular reason.

At the hearing on Johnson's motion to suppress evidence, Sergeant Grizzle explained that the traffic stop was ordered because of the anonymous tip the police department had received. When the Narcotics Unit officers arrived, the patrol officer already had both Johnson and Highsmith out of the van. Johnson gave Sergeant Grizzle permission to search the van, and Detective Sullivan proceeded to examine the interior. In the meantime, the officers learned that Highsmith's driver's license had been suspended and that there were several warrants outstanding on her. At that point, Highsmith was placed under arrest.

In the course of her search of the vehicle, Detective Sullivan discovered a clear plastic bowl with a snap-on lid containing an off-white, chunky, powdery substance that Sergeant Grizzle recognized as methamphetamine — an identification subsequently confirmed by testing. Johnson and Highsmith were then arrested on drug charges.

Following a hearing, conducted on November 4, 1992, on Johnson's motion to suppress the seized contraband, the circuit court ruled that the officers had a sufficient basis for the investigatory stop and therefore found the evidence admissible. On January 15, 1993, Johnson entered a conditional plea of guilty to the Class Y felony of possession of amphetamine with intent to deliver, reserving the right to appeal the outcome of the hearing on his

motion to suppress the seized evidence. The circuit court entered judgment on January 21, 1993, sentencing Johnson to twenty years imprisonment, with ten years suspended. The majority opinion describes the route by which the case reached this court.

In its brief, the State argues that the anonymous informant had provided the police with specific information about Johnson's activities and that the officers had past experience with him. The combination of past and present knowledge, the State contends, was sufficient to constitute reasonable suspicion warranting the investigatory stop of the van.

Under Ark. R. Crim. P. 3.1, a law enforcement officer may, in the lawful performance of his duties, "stop and detain any person who he *reasonably suspects* is committing, has committed, or is about to commit . . . a felony. . . ." (Emphasis added.) This rule incorporates the holding of the United States Supreme Court in *Terry* v. *Ohio*, 392 U.S. 1 (1968).

"Reasonable suspicion" is defined in Ark. R. Crim. P. 2.1 as:

a suspicion based on facts or circumstances which of themselves do not give rise to the probable cause requisite to justify a lawful arrest, but which give rise to more than a bare suspicion; that is, a suspicion that is reasonable as opposed to an imaginary or purely conjectural suspicion.

Reasonable suspicion entails a consideration of the totality of the circumstances and the existence of particularized, specific reasons for a belief that a person may be engaged in criminal activity. *Stout* v. *State*, 304 Ark. 610, 804 S.W.2d 686 (1991).

In a case dealing with an anonymous telephone tip, the United States Supreme Court, in *Alabama* v. *White*, 496 U.S. 325 (1990), placed special emphasis on independent corroboration by the police of information supplied by the unknown informant. The Court stressed, in particular, the value of predictions made by the informant regarding future actions of third parties because they "demonstrated inside information — a special familiarity with respondent's affair." 496 U.S. at 332.

During direct examination at the hearing on the motion to suppress, Sergeant Grizzle noted that the police had previously "received information about Mr. Johnson that he was actually

and actively dealing methamphetamine, and foreign amphetamine, crank, in Fort Smith and the surrounding area." He averred that he and Johnson "have been involved with each other, so to speak, for the last four or five years" and that he had "been involved with arresting court procedures on Mr. Johnson on several different occasions." Without specifying a time frame, Sergeant Grizzle, on cross-examination, stated that "[w]e had been getting information on Billy Ray for quite some time."

On direct examination, Sergeant Howard explained that part of the basis for police suspicion of Johnson was attributable to the fact that "[b]oth Mr. Johnson and Ms. Highsmith had been arrested before for drug violations, and then we also had current intelligence that they were both involved once again in the distribution of amphetamines." He commented that "[a]pparently Sergeant Grizzle and Billy Ray Johnson have known each other off and on for a number of years, and they seemed to have the best rapport with each other. . . ."

During cross-examination at the hearing, Sergeant Howard conceded that the information which served as a justification for the investigatory stop was an anonymous tip and that the informant's reliability was problematic:

> Q: Was the reason for the stop because of the suspected, because of the information that you had received from your secretary?
>
> A: Yes, sir.
>
> Q: Now, normally, you classify individuals as reliable confidential informants or just, I guess, anonymous tips. This was an anonymous tip?
>
> A: Yes, sir.
>
> Q: So, you couldn't get a search warrant.
>
> A: I'm sure we probably couldn't have. I'm saying I'm sure we couldn't have. It was not attempted, so I —
>
> Q: This individual, you had no reason to believe they were reliable?
>
> A: I wouldn't have tried to get a search warrant. I'll put it that way.

When asked to describe what he meant by his earlier statement that the police department had "current intelligence," Sergeant Howard responded that:

> I would say within the past ninety days we had been off and on receiving information that Mr. Johnson was involved with Benny Roam, with several individuals in that area, some Sharp boys, a gentleman named Smithson, another boy from down in — I mean, just off and on —and some of this information was from what I would consider reliable informants.

At best, one can only assume that the police surmised that these "individuals" were engaged "just off and on" in some sort of unlawful activity. It is significant that Sergeant Howard conceded that the information did not specify whether Johnson and the others were "hanging out together" or whether drugs were involved or whether a confidential informant had made a drug purchase. Although invited to respond in a specific manner, the most he could say, somewhat vaguely, was that "the information was that they were involved."

Thus, what the police had available was an anonymous telephone tip of uncertain reliability and information that may have been as much as three months old. To focus, as the majority does, upon knowledge of past arrests extending back over a period of years or indefinite information provided "within the past ninety days" is to ignore the requirements relating to anonymous tips. Sergeant Howard admitted that the information was not sufficiently reliable to enable the police to obtain a search warrant. Further, no prediction was offered by the unknown tipster about Johnson's future behavior. Obviously missing, then, was any sort of special familiarity with Johnson's affairs. *See Alabama* v. *White, supra.*

While reasonable suspicion is on a lower rung of certitude than probable cause, *Tillman* v. *State*, 275 Ark. 275, 630 S.W.2d 5 (1982), *cert. denied*, 459 U.S. 1201 (1983), a threshold still must be crossed to justify an investigatory stop and search. Simply put, the State, with its anonymous tip and imprecise, presumptively stale corroborative information, failed to cross the threshold of reasonable suspicion.

I would, therefore, reverse the judgment of the circuit court.

DUDLEY and NEWBERN, JJ., join in this dissent.